IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

JASON SIMPSON,                          )
                                        )
         Plaintiff,                     )
                                        )
vs.                                     )   Case No. 15-cv-906-JPG-CJP
                                        )
CAROLYN W. COLVIN,                      )
Acting Commissioner of Social Security, )
                                        )
         Defendant.                     )

## MEMORANDUM and ORDER

**GILBERT, District Judge:**

In accordance with 42 U.S.C. § 405(g), plaintiff Jason Simpson, represented by counsel, seeks judicial review of the final agency decision denying his application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits pursuant to 42 U.S.C. § 423.

## Procedural History

Mr. Simpson applied for benefits in March 2012, alleging disability beginning on March 31, 2008. After holding an evidentiary hearing, ALJ Joseph W. Warzycki denied the application on June 5, 2014 (Tr. 22-32). The Appeals Council denied review, and the decision of the ALJ became the final agency decision subject to judicial review (Tr. 1).

Administrative remedies have been exhausted and a timely complaint was filed in this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following points:

1. The ALJ misquoted and ignored part of the testimony of Dr. Bentham, a testifying medical expert.

2. The ALJ ignored grossly abnormal behavior by plaintiff at the hearing.

3.         The ALJ ignored the testimony of plaintiff's father.

## Applicable Legal Standards

To qualify for DIB or SSI benefits, a claimant must be disabled within the meaning of the applicable statutes.   In this context, "disabled" means the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."   42 U.S.C. §423(d)(1)(A).[1]

A "physical or mental impairment" is an impairment resulting from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques.   42 U.S.C. §423(d)(3).   "Substantial gainful activity" is work activity that involves doing significant physical or mental activities and that is done for pay or profit.   20 C.F.R. §§ 404.1572.

Social Security regulations set forth a sequential five-step inquiry to determine whether a claimant is disabled.   The Seventh Circuit Court of Appeals has explained this process as follows:

> The first step considers whether the applicant is engaging in substantial gainful activity.   The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step compares the impairment to a list of impairments that are considered conclusively disabling.   If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues.   The fourth step assesses an applicant's residual functional capacity (RFC) and ability to engage in past relevant work.   If an applicant can engage in past relevant work, he is not disabled.   The fifth step assesses the applicant's RFC, as well as his age, education,

---

[1] The statutes and regulations pertaining to Disability Insurance Benefits (DIB) are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404.   The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations.   Most citations herein are to the DIB regulations out of convenience.

> and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

*Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008); *accord Weatherbee v. Astrue*, 649 F.3d 565, 568-69 (7th Cir. 2011).

Stated another way, it must be determined: (1) whether the claimant is presently unemployed; (2) whether the claimant has an impairment or combination of impairments that is serious; (3) whether the impairments meet or equal one of the listed impairments acknowledged to be conclusively disabling; (4) whether the claimant can perform past relevant work; and (5) whether the claimant is capable of performing any work within the economy, given his or her age, education and work experience. 20 C.F.R. § 404.1520; *Simila v. Astrue*, 573 F.3d 503, 512-13 (7th Cir. 2009); *Schroeter v. Sullivan*, 977 F.2d 391, 393 (7th Cir. 1992).

If the answer at steps one and two is "yes," the claimant will automatically be found disabled if he or she suffers from a listed impairment, determined at step three. If the claimant does not have a listed impairment at step three, and cannot perform his or her past work (step four), the burden shifts to the Commissioner at step five to show that the claimant can perform some other job. *Rhoderick v. Heckler*, 737 F.2d 714, 715 (7th Cir. 1984). *See also Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001) (Under the five-step evaluation, an "affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled…. If a claimant reaches step 5, the burden shifts to the ALJ to establish that the claimant is capable of performing work in the national economy.").

This Court reviews the Commissioner's decision to ensure that the decision is supported by substantial evidence and that no mistakes of law were made. It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if

supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Mr. Simpson was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *See Books v. Chater*, 91 F.3d 972, 977-78 (7th Cir. 1996) (citing *Diaz v. Chater*, 55 F.3d 300, 306 (7th Cir. 1995)). This Court uses the Supreme Court's definition of substantial evidence, *i.e.*, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir. 1997). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

### The Decision of the ALJ

ALJ Warzycki followed the five-step analytical framework described above. He determined that plaintiff had worked part-time after the alleged onset of disability, but that work did not rise to the level of substantial gainful activity. He was insured for DIB only through September 30, 2015.[2]

The ALJ found that plaintiff had severe impairments of schizophrenia and exertional shortness of breath. He further determined that these impairments do not meet or equal a listed impairment.

The ALJ found that Mr. Simpson had the residual functional capacity (RFC) to perform

---

[2] The date last insured is relevant only to the claim for DIB.

work at the medium exertional level with some mental limitations.   The mental limitations were that plaintiff was limited to simple, repetitive and routine tasks that require only occasional decision-making, and to only occasional interactions with supervisors, co-workers and the public.[3]

Based upon the testimony of a vocational expert, the ALJ found that plaintiff was still able to do his past work as a cleaner.   In the alternative, he was able to do other jobs that exist in significant numbers in the regional and national economies, *i.e.*, dishwasher and cleaner.

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in formulating this Memorandum and Order.   The following summary of the record is directed to the points raised by plaintiff and is confined to the relevant time period.   In view of the points raised, a detailed review of the medical records is not necessary.

**1.      Agency Forms**

Plaintiff was born in 1983 and was 24 years old on the alleged date of onset (Tr. 306).   He had worked in the past in fast food restaurants and doing cleaning at a casino (Tr. 243).

**2.      Evidentiary Hearing**

Mr. Simpson was represented by an attorney at the evidentiary hearing in May 2014 (Tr. 38).

Dr. Jack Bentham, a board certified psychologist, testified as an impartial medical expert. He did not examine plaintiff, but testified based on a review of the records (Tr. 44-45).   He testified that plaintiff had been diagnosed with schizophrenia (Tr. 45).

Plaintiff's counsel asked Dr. Bentham whether plaintiff had any limitations in interacting with supervisors in a workplace.   The following exchange took place:

---

[3] The agency defines occasional as "occurring from very little up to one-third of the time." SSR 83-10, 1983 WL 31251, *5-6.

> A: I would place the, the problem actually is the interaction with the public in general. And I would think that interactions with supervisors and coworkers would be limited.
>
> Q: And would you say no interaction or superficial interaction, or what, in your opinion, what kind of limits would you place?
>
> A: I would put the individual into a job setting where they would be responding to simple types of instructions. And I would have them have minimal interplay in a team setting environment. And would make sure that the supervision was sensitive to his abilities to handle criticism.

Plaintiff's counsel then asked Dr. Bentham to repeat what he had said regarding interaction with supervisors. The testimony continued:

> A: Actually, what I'm stating is is [sic] that the supervisor needs to broach their oversight in a way that is sensitive and not insulting and non-directive, because this claimant would respond very negatively to that.
>
> Q: So would you be referencing a, would this be like a special accommodation for this type of individual?
>
> A: I don't know, I'd have to defer to the vocational expert. There are job settings for the individual that has [sic] minimal contact with the public, is not in a team type of setting because of the nature of their job. And it would be such that it would have supervisory oversight, but it wouldn't be directly involving on a direct basis as often. But that's up to, I think, the vocational expert (INAUDIBLE).

(Tr. 45-47).

After questioning the doctor on other topics, plaintiff's counsel returned to the issue of interaction with supervisors:

> Q: And you said that the supervisor when giving instruction must be sensitive to this individual?
>
> A: I would assume that most supervisors would, but it's very crucial that, you know, you can get supervisors that are very hard-nosed and state things in a way that are [sic] more negative than positive. That type of supervisory style would not work with your claimant.

(Tr. 49).

The ALJ did not ask Dr. Bentham any further questions regarding plaintiff's ability to accept supervision.

Mr. Simpson testified that he lived with his parents (Tr. 51).  He had no medical insurance (Tr. 52).  He testified that he used a computer and read up on the internet about projects that he was working on.  He said he worked on building websites and he was working a "spider walkie talkie sound system for a house" (Tr. 59).  He later clarified that he had never actually made a website or a walkie talkie system (Tr. 66).  He was supposed to be taking Latuda, but had difficulty getting it.  He had to go to Granite City and talk to a nurse practitioner, and they gave him samples, maybe every two weeks (Tr. 62).  When he took Latuda, it stopped him from hearing voices, but he still had some visual hallucinations (Tr. 67).

Plaintiff was wearing "armor" that he had made from license plates and wires.  He used it to guard his chest and to tighten and push up his neck so he could breathe easier.  He had been making and wearing such armor for the past five years (Tr. 67-68).

Plaintiff's father testified that plaintiff had mood swings and became agitated.  He also became violent when he drank alcohol.  He had hit both his father and mother.  He continued to wear license plates and to come up with "elaborate contraptions" even when he was taking his medicine (Tr. 70-72).

A vocational expert (VE) also testified.  The ALJ asked him a hypothetical question that corresponded to the ultimate RFC findings.  The VE testified that this person could do plaintiff's past work as a cleaner and could also do other jobs such as dishwasher and other cleaner jobs (Tr. 75-76).

Plaintiff's counsel asked the VE some questions about plaintiff's ability to interact with

supervisors:

> Q: If we had a restriction that, in addition to the restrictions that the Judge posed, if we had a restriction that the hypothetical individual could not be around any supervisors with a confrontational style of supervising, is there any way to accommodate that by job numbers, or is that generally a preclusive limitation for work?
>
> A: Well, could we be [sic] a little more clarification in the confrontational aspect? This is from the supervisor, correct?
>
> Q: Correct, from the supervisor, yes, Doctor. Is there any way to identify jobs where the supervisor would be more forgiving or less confrontational than the average supervisor?
>
> A: Well, to clarify for what I'm interpreting, you know, what I'm hearing is that a supervisor is going to correct an employee when the employee does not meet the work-related activities, or continues to commit errors based on work-related activities. If the supervisor did not provide normal supervision, but took on more of a less, a very – less restrictive input, that would become more in the nature of supported employment.
>
> Q: Okay, so in other words that would put us into a sheltered work environment?
>
> A: Yes.

(Tr. 76-77).

## Analysis

While it is true that an ALJ is not required to discuss every piece of evidence in the record, it is well-established that an ALJ "may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014), collecting cases. ALJ Warzycki erred in violating that rule here.

Dr. Bentham testified as an independent medical expert. 20 C.F.R. § 404.1527(e) obligates the ALJ to consider his opinion as that of a nonexamining medical source and to evaluate it according to the factors listed in 20 C.F.R. § 404.1527(a) through (d). ALJ Warzycki

acknowledged that Dr. Bentham is a mental health expert, he reviewed all of plaintiff's medical records, and he is "experienced in evaluating mental impairments under the regulations." The ALJ assigned "great weight" to his opinions, noting that they were consistent with the rest of the record. The ALJ did not say that he rejected any part of Dr. Bentham's opinion (Tr. 30).

Despite accepting Dr. Bentham's opinion as a whole, the hypothetical question addressed to the VE and the RFC assessment did not reflect Dr. Bentham's opinion with respect to plaintiff's ability to interact with supervisors. The hypothetical question and the RFC assessment limited plaintiff to only occasional interaction with supervisors. Plaintiff argues, correctly, that Dr. Bentham testified that plaintiff is limited in the *quality*, and not just the frequency, of supervisory interaction, and that the ALJ ignored that part of his testimony.

In relevant part, the ALJ characterized Dr. Bentham's testimony as limiting plaintiff to "not as often" supervision (Tr. 30). This characterization ignores most of what Dr. Bentham said about plaintiff's ability to interact with supervisors.

Dr. Bentham's testimony is quoted at length above. While Dr. Bentham did refer to the frequency of supervision, it is incorrect to say that he did not also testify about limits on the quality of supervision as well. Dr. Bentham testified that plaintiff requires supervision that is "sensitive to his abilities to handle criticism" and "the supervisor needs to broach their oversight in a way that is sensitive and not insulting and non-directive" (Tr. 46). He also testified that a supervisor who was "hard-nosed" and stated things in a negative rather than a positive way "would not work" for plaintiff (Tr. 49).

Defendant's brief fails to explain how a limitation to only occasional supervision accommodates the limitations on the quality of supervision testified to by Dr. Bentham. Rather, she argues that the question posed by plaintiff's counsel to the VE about needing supervision that

is "more forgiving or less confrontational than the average supervisor" misstates Dr. Bentham's testimony. However, the issue here is whether the ALJ's hypothetical question and his RFC assessment accounted for all of the limitations found by Dr. Bentham.

Defendant also argues that the limitation to occasional interaction with supervisors is consistent with the Mental RFC Assessment completed by state agency consultant Howard Tin. That argument also misses the mark. The issue here is not whether there was other evidence in the record to support the RFC assessment. Rather, the issue is that the ALJ gave great weight to Dr. Bentham's opinion as a whole, but failed to account for all limitations testified to by Dr. Bentham in his hypothetical question and RFC assessment.

The ALJ also erred in failing to explain how he regarded the testimony of plaintiff's father and the fact that plaintiff wore "armor" made of license plates to the hearing.

The ALJ is required to consider all of the evidence in making his decision. 20 C.F.R. § 1520(a)(3). Evidence that must be considered includes testimony by people other than the claimant. 20 C.F.R. § 404.1512(b)(3).

The ALJ made passing reference to the father's testimony, noting that he testified that plaintiff "has a history of alcohol and drug abuse, with violent and odd behavior" and that he "regularly suffers from auditory and visual hallucinations" (Tr. 27). The ALJ did not, however, state whether he accepted this testimony as credible. Further, he did not acknowledge that the father testified that plaintiff still experienced significant symptoms even while taking medication, such as violent mood swings, wearing license plate armor, "coming up with these elaborate contraptions," and having visual hallucinations (Tr. 71). And, though the record reflected that plaintiff was wearing his license plate armor, the ALJ failed to discuss that fact.

The Court recognizes that the ALJ is not required to discuss every piece of evidence.

However, in the context of this case, the failure to grapple with the father's testimony and plaintiff's own odd presentation at the hearing was error. The ALJ found that plaintiff has schizophrenia, but concluded that the effects of the disease were not disabling. In making that finding, he erred by ignoring a line of evidence that suggests that the effects could be more severe than he credited. *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013).

Because of the ALJ's errors, this case must be remanded to the Commissioner for rehearing. The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that Mr. Simpson was disabled during the relevant period, or that he should be awarded benefits. On the contrary, the Court has not formed any opinions in that regard, and leaves those issues to be determined by the Commissioner after further proceedings.

## Conclusion

The Commissioner's final decision denying Jason Simpson's application for DIB and SSI benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. § 405(g).

The Clerk of Court is directed to enter judgment in favor of plaintiff.

**IT IS SO ORDERED.**
**DATE:   January 25, 2017**

s/ J. Phil Gilbert
**J. PHIL GILBERT**
**DISTRICT JUDGE**